## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **BARBARA A. MACK,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE** |
| **v.** | : | **NO. 1:05-CV-2444-AJB** |
| | : | |
| **JO ANNE BARNHART,** | : | |
| **Commissioner of Social** | : | |
| **Security Administration,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>OPINION AND ORDER</u>[1]

Plaintiff Barbara Mack brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social Security Act ("the Act").[2]   For the reasons set forth herein, the undersigned

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [Docs. 15-16]. Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal DIB.  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the disabled.  Title XVI claims are not

**REVERSES** the Commissioner's decision to deny benefits, and **REMANDS** this

matter to the Commissioner for further consideration of Plaintiff's claims.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for SSI and DIB on October 21, 2002, alleging

disability commencing on October 4, 2002.[3]    [Record (hereinafter "R") 42-44].

Plaintiff's application was denied initially and on reconsideration.  [R20-25, 29-32].

Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R33].

An evidentiary hearing was held on July 22, 2004.  [R217-36].   The ALJ issued a

decision on March 25, 2005, denying Plaintiff's claims on the ground that she had not

been under a "disability" as defined by the Act.  [R10-19].  Plaintiff then sought review

by the Appeals Council.  [R216].  On June 23, 2005, the Appeals Council denied

---

tied to the attainment of a particular period of insurance disability. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).   Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI.   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim.  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

[3]       Plaintiff had previously filed an application for disability benefits.  [R13].

Plaintiff's request for review. [R6-7]. Plaintiff then filed an action in this Court on August 24, 2005, seeking review of the Commissioner's decision. [Doc. 2]. The answer and transcript were filed on April 17, 2006. [Docs. 6-7]. The matter is now before the Court upon the administrative record, the parties' pleadings and briefs, and oral argument. The case is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS

### A.    *Medical Records*

On January 29, 2001, Plaintiff arrived at the emergency care center ("ECC") of the Grady Health System ("Grady") by EMS complaining of right side facial drooping. [R170]. By the time Plaintiff had arrived at the ECC, her facial drooping had improved, and she was discharged. [R171-72]. A note from Dr. Harrison indicated that Plaintiff should return to the hospital if her symptoms returned. [R173].

A January 30, 2001, provider report from Grady's ECC indicates that Plaintiff came to Grady complaining of slurred speech. The examiner noted that Plaintiff had slurred speech and right facial droop. Plaintiff was admitted. [R110]. A January 31, 2001, neurology history and physical form from Grady indicated that Plaintiff had acute onset dysarthria (a disturbance of speech due to emotional stress or to brain) and right

3

glossal (tongue) deviation.  [R115]. Plaintiff's mental status was as follows: (1) normal comprehension, repetition, and naming; and (2) moderate dysarthria - - "La La" difficulty.   [R113].   A February 2, 2001, discharge summary gave the following assessment: "Left subcortical lacunar infarct," *i.e.*, a stroke that occurred beneath the left cerebral cortex.  [R117].  Plaintiff was prescribed aspirin and Zocor (drug to reduce cholesterol levels) upon her discharge.  [R118].

On September 27, 2001, Dr. Christian Ohagwu examined Plaintiff, noting that Plaintiff did not suffer significant motor loss and Plaintiff's speech had improved tremendously with therapy.  At the time of her visit, Plaintiff lived alone and was able to perform household chores.  [R126].  Plaintiff was oriented to person, time, and place and had no evidence of muscle weakness.  [R128].  Following an examination, Dr. Ohagwu diagnosed Plaintiff with sustained systolic hypertension and a history of cerebrovascular accident ("CVA") and recommended that she make an appointment with her primary care physician to begin antihypertensive therapy.  Dr. Ohagwu found no motor or sensory neurological deficits and concluded that Plaintiff had recovered fully from residual effects of CVA.  [R129].

On November 13, 2002, Dr. Zia Abdi examined Plaintiff, whose chief complaint was weakness on the right side.  At this time, Plaintiff lived alone in an apartment

4

administered by the Atlanta Housing Authority, and she received financial help from her sister.  [R134].  A physical examination revealed that Plaintiff appeared well and not in acute distress.  [R135].  A mental status examination indicated that Plaintiff was alert, awake, and oriented to time, place, and person.  Plaintiff's speech was minimal but she articulated well.  Plaintiff had adequate attention span.  Plaintiff had no muscle atrophy and her gait was normal.  [R136].  Her speech was minimally slurred, but she articulated well.  Dr. Abdi's assessment was as follows: (1) clinically stable; (2) history of mild CVA with adequate recovery; (3) history of elevated cholesterol levels; and (4) unremarkable clinical evaluation.  [R136].

On April 18, 2003, Plaintiff had a psychiatric diagnostic evaluation at the Fulton County Department of Mental Health, Mental Retardation, and Substance Abuse ("the Health Department").  On the evaluation form, the following physician's name was given: Dr. Jaiyesinmi.  Plaintiff's chief complaint was that she stayed depressed. The form indicated that Plaintiff had a one year history of depressive symptoms. Plaintiff admitted to experiencing irritability and excessive worrying.  [R157]. A mental status examination indicated that Plaintiff was somewhat groomed, cooperative, and had fair eye contact.  Plaintiff's mood was depressed and her affect was dysthymic (depressed).  Plaintiff was diagnosed as follows: (1) Axis I, major

5

depressive disorder ("MDD"); (2) Axis II, deferred; (3) Axis III, hypertension, CVA, and abnormal thyroid; (4) Axis IV severe health problems and financial problems; and (5) Axis V, Global Assessment of Functioning ("GAF") score of 55.[4]  Plaintiff was admitted into treatment and prescribed 10 mg of Lexapro (an antidepressant and anti-anxiety drug) and 50 mg of Benadryl (pain reliever).  At the bottom of the second page of the form, an illegible signature is above the "Physician Signature" line.  [R158].

Also on April 18, a social worker from the Health Department indicated that Plaintiff continued to be depressed since her stroke, one year ago, and noted that she: (1) lacked energy; (2) was easily distracted; (3) had poor concentration; (4) has little appetite; (5) was easily agitated; and (6) felt sad and alone.  [R159].  The social worker then gave the following diagnosis: (1) Axis I, MDD; (2) Axis II, speech problem; (3) Axis III, stroke a year ago; and (4) Axis IV, unemployed, financial problems, and medical problems.  [R160].

_____

[4]        "The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning."  *Haag v. Barnhart*, 333 F. Supp. 2d 1210, 1214 (N.D. Ala. 2004) (citing Diagnostic and Statistical Manual of Mental Disorders at 32 (4th Edition, Text Revision) ("DSM IV").  A GAF score between 51 and 60 "identifies moderate symptoms or moderate difficulty in social, occupational or school functioning."  *Matthews v. Barnhart*, 347 F. Supp. 2d 1093, 1097 (M.D. Ala. 2003) (citing DSM IV at 32).

A May 22, 2003, Health Department progress note indicated that Plaintiff's affect, mood, thought process, orientation, and behavior were unremarkable. The note stated that Plaintiff received interventions involving grief therapy and problem solving concerning family relationships. Plaintiff's goals were to make progress toward her depression, coping skills, social skills, and improving her patience. The note also indicated that Plaintiff needed social contact, and indicated that she should bring books and CDs to listen to when shopping with her sister even though she did not like shopping. The note further stated that Plaintiff attended church three (3) days per week. [R163].

A Health Department progress note from July 24, 2003, indicated that Plaintiff's affect and mood were remarkable but within normal limits while her thought process, orientation, and behavior were unremarkable. The note also indicated that Plaintiff was attending church and would come to depression/stress management therapy. [R162].

A physician's order sheet from the Health Department indicated that Plaintiff was prescribed: (1) Lexapro and Benadryl on April 18, 2003; (2) Lexapro and Benadryl on May 22, 2003; (3) Lexapro and Benadryl on July 24, 2003; and (4) Lexapro, Benadryl, and "prenatal MVI" on September 26, 2003, for which she was given two refills. [R161].

On August 11, 2003, Plaintiff visited Grady for a routine health management visit.  Plaintiff indicated that she felt stress, depression, and tired all the time.  [R167].  The following assessment was given: (1) well-controlled hypertension; (2) high cholesterol; (3) stroke; (4) depression; and (5) "HM."  It was noted that Plaintiff received medications at the mental health department for her depression.  [R168].

Plaintiff visited Grady on January 12, 2004, for a routine appointment.  At this time, Plaintiff indicated that she wanted disability benefits and felt weak all the time.  There were also notations that Plaintiff was taking medication for depression and had a history of depression.  [R165].  Plaintiff was given the following assessment: (1) controlled hypertension; (2) increased cholesterol, which led to an increase in her Zocor dosage; and (3) stable following CVA except for speech impairment.  [R166].

A Health Department physician's order sheet indicated that Plaintiff was prescribed Lexapro, Benadryl, and two other drugs on May 24, 2004.  [R187].

A May 26, 2004, Group Treatment note from the Health Department indicated that Plaintiff and the group discussed an article entitled "How to be Depressed and How to be Happy (14 Ways)."  Plaintiff's affect, mood, thought process, orientation, and behavior were unremarkable.  Plaintiff stated that she had a difficult time being happy, but she would start looking for positive things and would be thankful.  [R190].

8

A June 9, 2004, Group Treatment Note indicated that the group members gave their definition of happiness and discussed what they would do to be more happy. The group members were given cognitive behavior therapy to assist in changing their negative thought patterns.  Plaintiff indicated that she benefitted from the group handouts and that she would get more involved with her peers.  [R189].

A June 30, 2004, Group Treatment Note indicated that Plaintiff had no significant change from her last visit and that her affect, mood, thought process, orientation, and behavior were unremarkable.  The group examined how to increase self-esteem, and Plaintiff stated that she had problems feeling good about herself. [R188].

On July 19, 2004, Plaintiff was seen in Grady's ECC for left leg pain.  [R195]. Plaintiff's feet were x-rayed on July 21 at Grady's urgent care clinic.  [R193-94].

B.    *March 18, 2004, Evidentiary Hearing Before the ALJ*

Plaintiff was born on August 18, 1950, and was 53 years old at the time of the evidentiary hearing.  [R222].  Plaintiff testified that she completed school through the ninth grade, after which she received her GED.  [R223].  Following Plaintiff's stroke, she continued to have pain in her right leg and arm and numbness in her right leg and fingers.  [R227].  Plaintiff's speech also continued to be affected by her stroke.

9

Plaintiff indicated that she had poor concentration and had difficulty remembering things.  [R229].  Plaintiff stated that she could stand for 30 minutes before she needed to sit down and she could walk one block before needing to rest.  Her left foot would also swell, and she would need to elevate her foot one hour to help with the pain.  [R230].  Plaintiff indicated that she had been treated at the West Mental Clinic for her mental health every Wednesday.  [R231].

The vocational expert ("VE") testified that a hypothetical individual would be able to perform her past relevant work as a laundry worker under the following circumstances: she was 53 years old, had a GED, and was limited to light work that involved simple, repetitive tasks, and a moderate pace.  The VE also testified that the hypothetical individual could perform other jobs, including cashier, cafeteria attendant, and packing machine tender.  [R234].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.     The claimant's residual effects of cerebrovascular accident are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4.     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.     The claimant has the following residual functional capacity: lift and carry fifty pounds occasionally and twenty-five pounds frequently, she can stand or walk for six hours of an eight hour workday, and she can sit for six hours of an eight hour workday.

7.     The claimant's past relevant work as a laundry worker did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.     The claimant's medically determinable impairment of the residual effects of a cerebrovascular accident do not prevent the claimant from performing her past relevant work.

9.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

[R18].

The ALJ explained that the residual effects of Plaintiff's CVA were severe, but

that Plaintiff's depression was not severe because the record showed that the claimant

11

had not had the impairment for at least 12 months.  [R15].  The ALJ found that Plaintiff's allegations of disabling impairments were not fully credible because they were not consistent with objective medical findings.

In determining Plaintiff's residual functional capacity ("RFC"), the ALJ found that Plaintiff was able to perform at least medium work activity as the evidence showed Plaintiff had minimal sequelae (condition resulting from a medical disease) from her CVA, and Plaintiff had 5/5 muscle strength in her upper extremities and her hand grip. [R16].  The ALJ then explained that Plaintiff's depression was not severe for a period longer than one year because: (1) the April 18, 2003, diagnosis of Major Depressive Disorder from a social worker was not given weight as the social worker was not an acceptable medical source; (2) even if a doctor had signed the April 18 document, there was no evidence that depression persisted for one year; and (3) a report from Grady Hospital on August 11, 2003, merely noted depression without officially diagnosing it. [R17].  As a result, the ALJ found that Plaintiff had the following RFC: (1) the ability to lift and carry 50 pounds occasionally and 25 pounds frequently; (2) the ability to stand and walk for 6 hours of an 8 hour workday; and (3) the ability to sit for 6 hours of an 8 hour workday.

AO 72A
(Rev.8/82)

The ALJ then found that the medical evidence indicated that Plaintiff's mental impairment did not result in restrictions of daily living, and failed to show difficulties in maintaining social functioning. The ALJ determined that Plaintiff's mental impairment resulted in mild deficiencies of concentration, persistence, and pace. The ALJ then found, based on the vocational expert's testimony, that Plaintiff could return to her past relevant work as a laundry worker or could perform the following jobs in the national economy: cashier, cafeteria attendant, and packing machine tender. [R17-18].

## IV.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in

AO 72A
(Rev.8/82)

any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments which significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to

14

prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work.   *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.   *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

15

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether

16

AO 72A
(Rev.8/82)

substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff claims that the ALJ erred because: (1) he failed to include Plaintiff's mental limitations in the RFC determination; and (2) substantial evidence does not support the ALJ's finding that Plaintiff's mental limitations were mild since the mental limitations were severe. [Doc. 12]. Concerning the RFC determination, Plaintiff argues that the ALJ erred by not including Plaintiff's mild deficiencies of concentration, persistence, and pace in the RFC despite the regulations' requirement that all limitations be considered in the RFC. [*Id.* at 7]. As for whether Plaintiff's depression was a severe impairment, Plaintiff argues that the substantial evidence does not support the ALJ's mild determination because: (1) Plaintiff's GAF score was 55;

17

(2) the mental health record indicated that Plaintiff had decreased energy, was easily distracted, and had poor concentration since her stroke; (3) Grady diagnosed Plaintiff as suffering from depression in August 2003; (4) a Grady note indicated that Plaintiff was taking medication for depression in January 2004; and (5) Plaintiff received mental health treatment throughout 2003 and into 2004.  As a result of this error, Plaintiff asks that the Court remand the case.  [*Id.* at 8-9].

The Commissioner responds that the ALJ did not err because Plaintiff failed to show that her alleged depression lasted for a consecutive 12 month period and the evidence suggests that it did not last 12 consecutive months because of the gap in treatment between July 2003 and May 2004.   [Doc. 13 at 15, 17-18]. The Commissioner then argues that the following substantial evidence supports the ALJ's finding that Plaintiff did not suffer from a severe mental impairment: (1) Plaintiff waited more than five months to seek treatment after her onset; (2) there is no indication from the health professionals that Plaintiff's depression interfered with her ability to work; (3) subsequent therapy notes indicated that Plaintiff's mental status was unremarkable; and (4) there is a gap between July 2003 and May 2004 where Plaintiff did not seek mental health treatment.  [*Id.* at 16-17].  The Commissioner next observes that Plaintiff's medications appear to have helped her impairment because there were

18

extended periods where she did not seek treatment for depression.  [*Id.* at 18-19].  The Commissioner further argues that the GAF score in April 2003 should not be given weight because: (1) the Commissioner has found no correlation between the GAF score and the severity of the mental disorder; (2) the GAF score simply reflects Plaintiff's symptoms on April 18, 2003, and there is no indication that it was tied to work-related limitations; and (3) there is no authority that requires the ALJ to give weight to a single GAF score.  [*Id.* at 19-21].

The Commissioner then argues that the ALJ did not err in omitting mental limitations in the RFC for the following two reasons.  First, Plaintiff failed to show that she suffered a mental limitation for a 12-month period.  [*Id.* at 20-21].  Second, the RFC did not have to include the ALJ's finding that Plaintiff's mental condition only caused mild deficiencies of pace, persistence, and concentration because the ALJ made this finding in conjunction with the psychiatric review technique used to rate severity at steps two and three of the evaluation process.  The Commissioner then argues that because the RFC is used at steps 4 and 5 of the evaluation process, the findings of the psychiatric review technique are not used to assess the RFC.  [*Id.* at 21-23].  Finally, the Commissioner contends that even if the ALJ erred, such error was harmless because the VE found that a hypothetical person who performed simple, repetitive tasks with

19

only a moderate pace could perform past relevant work and other work. The Commissioner claims that Plaintiff cannot show that she had other mental limitations that were not posed to the VE.  [*Id.* at 24].

## VII.   DISCUSSION

### A.   *Severity of Plaintiff's Depression*

The parties raise two issues concerning whether the ALJ erred in determining that Plaintiff's depression was not severe.  By arguing that Plaintiff's depression did not last 12 continuous months, the Commissioner raises that issue of whether substantial evidence supports the ALJ's conclusion that Plaintiff's depression did not last for 12 consecutive months.  The second is whether substantial evidence supports the ALJ's determination that the depression was not severe.  The Court notes that these arguments concern step 2 of the evaluation process.  Therefore, the analysis only concerns whether the medical evidence supports the non-severity finding.  *See* Social Security Ruling ("SSR") 85-28; *Knepp v. Apfel*, 204 F.3d 78, 84 (3d Cir. 2000) ("An ALJ only considers medical evidence in step two, without regard to vocational factors such as the claimant's age, education, or work experience.").

20

1.     *Duration of Plaintiff's Depression*

The regulations state: "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509, 416.909.  This regulation does not require that the impairment last 12 months, but requires that the impairment last or be expected to last for a continuous period of 12 months or more.  *See* 20 C.F.R. §§ 404.1505(a), 416.905(a); *see also Haag v. Barnhart*, 333 F. Supp. 2d 1210, 1216 (N.D. Ala. 2004).

During oral arguments before the Court, the Commissioner conceded that Plaintiff's depression lasted longer than twelve months.  As a result, the Court assumes that Plaintiff's depression lasted 12 months.

Even if the Commissioner had not made this concession, the Court concludes that the ALJ erred in determining that Plaintiff's depression had to last one year before it could be considered.  Instead, the regulations clearly state, the impairment meets the duration requirement if it is expected to last 12 months. *See* 20 C.F.R. §§ 404.1505(a), 416.905(a).  The ALJ's decision indicates that he believed Plaintiff's depression had to first last 12 months, which is clearly contrary to the regulations and the law. [R15, 17].

AO 72A
(Rev.8/82)

Further, substantial medical evidence does not support the ALJ's decision that Plaintiff's depression could not have been expected to last for a period less than 12 months.  First, it is undisputed that Plaintiff was diagnosed with Major Depressive Disorder on April 18, 2003.  Second, in the April 18 psychiatric diagnostic evaluation, the doctor indicated that Plaintiff had a one year history of depressive symptoms. [R183].  After April 18, Plaintiff was prescribed the anti-depressant Lexapro on April 18, 2003, May 22, 2003, July 24, 2003, September 26, 2003, and May 24, 2004. [R187].  Medical notes indicated that she was taking depression medication on January 12, 2004.  [R165].   Further, Plaintiff engaged in group therapy sessions for her depression on May 22, 2003, July 24, 2003, May 26, 2004, June 9, 2004, and June 30, 2004.  [R162-63, 188-90].  Although there is a gap between September 2003 and May 2004 where there is no documented treatment for the depression, "[c]ourts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment."  *Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135-36 (N.D. Ala. 2006).  As a result of Plaintiff's diagnosis, history of treatment, and history of depressive symptoms, the Court concludes that substantial evidence supports a finding that Plaintiff suffered from depression or could be expected to suffer from depression for 12 continuous months.

22

2.      *Severity of Plaintiff's Depression*

An impairment is severe if it "significantly limits [a claimant's] . . . mental ability to do basic work activities."   20 C.F.R. §§ 404.1520(c), 416.920(c).   Basic work activities are "the abilities and aptitudes necessary to do most jobs," which include physical functions, understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to work situations, coworkers, and supervisors, and dealing with changes in the work setting.   20 C.F.R. §§ 404.1521(b)(1), (3)-(6), 416.921(b)(1), (3)-(6); *see also Davis v. Heckler*, 748 F.2d 293, 296 n.7 (5th Cir. 1984) (indicating that §§ 404.1520(c), 416.620(c) must be read in light of § 416.921(b)).   An impairment is determined to be not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."   Soc. Sec. Ruling ("SSR") 85-28; *see also Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) ("An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.").   Thus, "[t]he severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic

23

work activities, as required in most jobs." SSR 85-28. The Eleventh Circuit and other circuits have described the severity standard as "de minimis." *See Stratton v. Bowen*, 827 F.2d 1447, 1452 (11th Cir. 1987); *see also Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) ("Step two, then, is a de minimis screening device [used] to dispose of groundless claims . . . .") (citations and internal quotation marks omitted); *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003) ("We have characterized this showing as 'de minimis,' but the mere presence of a condition is not sufficient to make a step-two showing.").

To determine whether a mental impairment is severe, the regulations require the Commissioner to rate the degree of a functional limitation resulting from the mental impairment. 20 C.F.R. §§ 404.1520a(b)(2), 404.920a(b)(2). The Commissioner is to consider: (1) all relevant and available clinical signs and laboratory findings; (2) the effects of the symptoms; and (3) how functioning is affected by factors including structured settings, medication, and other treatment. *Id.* §§ 404.1520a(c)(1), 404.920a(c)(1). The Commissioner then rates the degree of the claimant's functional limitation based on the extent that the impairment interfere's with her ability to function independently, appropriately, effectively, and on a sustained basis. *Id.* §§ 404.1520a(c)(2), 404.920a(c)(2). Specifically, the Commissioner rates the claimant

24

in the following four areas: (1) activities of daily living;[5] (2) social functioning;[6] (3) concentration, persistence, or pace;[7] and (4) episodes of decompensation.[8]  *Id.* §§ 404.1520a(c)(3), 404.920a(c)(3).  The Commissioner uses a five-point scale - - none, mild, moderate, marked, and extreme - - in evaluating the first three areas and a four-point scale - - none, one or two, three, or four or more - - in evaluating episodes of decompensation.  *Id.* §§ 404.1520a(c)(4), 404.920a(c)(4).  A mental impairment is

---

[5]     Activities of daily living include cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring for grooming and hygiene, paying bills, using telephones and the post office.  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 12.00(C)(1).

[6]     Social functioning indicates a capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals, including family, friends, and neighbors.  Impaired social functioning is demonstrated by avoidance of interpersonal relationships and social isolation while strength in social functioning is shown by the ability to communicate clearly with others or interact in and participate in group activities.  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 12.00(C)(2).

[7]     Concentration, persistence, or pace "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 12.00(C)(3).

[8]     Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning."  These episodes are demonstrated by an increase in symptoms that would require increased treatment or a less stressful situation and may be inferred by alterations in medication or the need for a more structured psychological support system such as hospitalization or halfway house.  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 12.00(C)(4).

considered not severe if the claimant is rated as "none" or "mild" in the first three areas and "none" in the episodes of decompensation area unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to perform basic work activities.  *Id.* §§ 404.1520a(d)(1), 404.920a(d)(1).

The Court finds that substantial evidence does not support the ALJ's non-severity determination and the ALJ did not properly explain why Plaintiff's depression was not a severe impairment.  Initially, the Court disagrees with Plaintiff that her April 18, 2003, GAF score of 55 required a finding of severity.  In an unpublished opinion, the Eleventh Circuit has explicitly noted that the Commissioner "has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  *Wind v. Barnhart*, 133 Fed. Appx. 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  Thus, Plaintiff's April 18, 2003, GAF score of 55 does not require a finding that her depression was severe. *See Deford v. Barnhart*, 347 F. Supp. 2d 1174, 1180 (M.D. Ala. 2004) ("[A] GAF of 50 is not suggestive of a severe mental deficiency.").

However, as discussed above, the Eleventh Circuit considers the severity requirement a "de minimis" standard that should be used to screen out meritless claims.

26

*See Stratton*, 827 F.2d at 1452.  The ALJ's basis for finding Plaintiff's depression not to be severe appears to be based on the following factors: (1) the medical evidence shows that Plaintiff did not have depression for at least 12 months, [R15, 17]; (2) Plaintiff was not given an official diagnosis of depression from Grady on August 11, [R17]; and (3) under the § 404.1520a evaluation process, Plaintiff only had mild deficiencies of concentration, persistence, and pace, and no restrictions in daily living or maintaining social functioning, and no evidence of decompensation, [R17]. These factors are either not sufficiently explained for the Court to determine whether they are supported by the substantial evidence or not supported by the substantial evidence for the following reasons.

First, as discussed above, the Commissioner conceded at oral argument that Plaintiff's depression lasted 12 months, and the evidence supports this concession. The Court further notes that, as discussed above, the ALJ used the wrong standard by stating that Plaintiff's depression had to last one year before her condition could be considered severe.

Second, Plaintiff was officially diagnosed by a doctor on April 18, 2003, that Plaintiff suffered from major depressive disorder.  [R183-84].  Contrary to the ALJ's statement, a doctor clearly filled out the psychiatric diagnostic evaluation.  [*Id.*].  Thus,

Plaintiff was diagnosed by a doctor that she had major depressive disorder.  Also, although the Grady notes do not officially give another diagnosis of depression, the notes indicate that Plaintiff informed the Grady medical providers of her depression on August 11, 2003 and January 12, 2004.  [R165, 168].  Thus, there is no evidence that any other medical professional disagreed with this depression assessment.

Third, the ALJ failed to explain how he found that Plaintiff only had mild deficiencies of concentration, persistence, and pace other than citing in general to the "medical evidence."  This failure to identify any evidence prevents the Court from determining how the ALJ ever made a determination that Plaintiff's concentration, persistence, or pace were mild.  *See Turner ex rel. Turner v. Barnhart*, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005) (requiring ALJ to provide enough detail in his analysis to show he gave evidence due regard) (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).[9]  The Court's review of the evidence indicates that the doctor who made the major depressive disorder diagnosis found that Plaintiff had irritability and excessive worry.  [R183].[10]  The social worker who also diagnosed

_____

[9]     Likewise, the ALJ failed to explain what medical evidence indicated that Plaintiff had no problems with daily living or social functioning.

[10]     The doctor also used a number of abbreviations, most of which the Court was unable to decipher.  [R183 ("(+)S, (+)I, (+)G, ↓E, ↓C, ↓A, (+)P, [and] ↓S - 4-5

28

MDD indicated that Plaintiff was easily distracted, had poor concentration, and was easily agitated.  [R159].  The only evidence indicating that Plaintiff's concentration, persistence, or pace were mild deficiencies was Dr. Abdi's November 2002 observation that Plaintiff's attention span was "adequate."  [R136].[11]  This one piece of medical evidence does not substantially support a finding of mild deficiencies in concentration, persistence, or pace.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998) (noting that "substantial evidence is 'more than a mere scintilla.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Fourth, in light of the "de minimis" severity standard, the Court finds that the following evidence indicates that Plaintiff's depression was more than a slight abnormality that affected her ability to work.  Plaintiff was diagnosed with Major Depressive Disorder on April 18, 2003.  [R183-84].  She was then prescribed Lexapro, an anti-depressant in April 2003, May 2003, July 2003, September 2003, and May

---

hrs.")].  However, it appears that the doctor found that Plaintiff had decreased concentration ("↓C") and decreased energy ("↓E").  [R183].

[11]     The Court recognizes that social worker notes described Plaintiff's thought process and behavior to be unremarkable on May 22, 2003, July 24, 2003, May 26, 2004, and June 30, 2004.  [R162, 163, 188, 190].  There is no indication that thought process applied to concentration, persistence, or pace, and the ALJ does not explain that he relied on these findings of "unremarkable" in evaluating Plaintiff's concentration, persistence, or pace.

29

2004.  [R161, 187].  Plaintiff's visits to Grady hospital in August 2003 and January 2004 indicated that Plaintiff at least complained of depression and was taking anti-depressant medications.  [R165, 168].  Plaintiff attended group therapy for her depression on multiple occasions where she worked on her self-esteem and her social skills.  [R162-63, 188-90].

Fifth, the Court finds the following arguments by the Commissioner to be unpersuasive.  Although the Commissioner argues that there was a delay before Plaintiff received treatment for her depression, which indicated that Plaintiff's depression was not severe, courts have observed that a delay in the treatment of depression should not be used as a basis to withhold benefits.  *See Sparks*, 434 F. Supp. 2d at 1136 (citing *Nguygen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).  Similarly, the Court is unpersuaded that the gap in treatment precludes Plaintiff's depression from being viewed as a severe impairment.  *See id.*; *see also Samuel v. Barnhart*, 295 F. Supp. 2d 926, 953 (E.D. Wis. 2003) ("Courts have repeatedly questioned the validity of a lay ALJ's observation that the plaintiff's frequency of treatment was insufficient to show a disabling mental impairment.").  As for the Commissioner's argument that the April 18 diagnosis did not find Plaintiff suffered from work-related limitations, the Court notes that Plaintiff's GAF score on

30

this day was 55, which indicates moderate difficulty in occupational functioning. [R184]. The Commissioner's arguments that subsequent medical examinations failed to show that Plaintiff suffered from work-related limitations are unpersuasive because these examinations were routine follow ups at Grady where Plaintiff sought treatment for her stroke, not her depression. Also, the group therapy notes focused on how Plaintiff would treat her depression, not on work-related limitations. There is no indication that any mental health provider evaluated whether Plaintiff's depression affected her ability to perform basic work activities. The Commissioner's argument that therapy notes found Plaintiff's mental status to be "unremarkable" makes the issue as to whether substantial evidence supports the finding that Plaintiff's depression was not severe closer. However, as discussed above, the Court does not believe that these findings of "unremarkable" support the ALJ's finding that Plaintiff only had mild deficiencies of concentration, persistence, and pace.[12] Also, as discussed above, the

---

[12]   The Court notes that the "unremarkable" notations came from social workers at the Department of Health whom the ALJ determined to be an unacceptable medical source as far as diagnosing depression. [R17]. The Commissioner's reliance on the social workers appears to contradict the ALJ's decision to give no weight to the social worker's diagnosis of depression. If the social worker's diagnosis on April 18, 2003, was not given weight, the Court is uncertain how the social worker's impression of Plaintiff's mental status on Plaintiff's subsequent visits to the Department of Health is entitled to weight.

AO 72A
(Rev.8/82)

other medical evidence indicates that Plaintiff's depression was more than a slight abnormality in that Plaintiff was diagnosed with MDD, was prescribed anti-depressants, and participated in group therapy for her depression.

Based on the above discussion, the Court finds that substantial evidence did not support the ALJ's decision that Plaintiff did not suffer from a severe impairment and that the ALJ failed to adequately explain his findings, thereby preventing the Court from determining whether they were supported by substantial evidence.

The Commissioner argues, however, that any error is harmless because the ALJ posed a hypothetical question to the VE limiting a person to simple, repetitive tasks at a moderate pace to which the VE responded that such a person could perform past relevant work and other work.  [Doc. 13 at 24].  An ALJ's decision is subject to harmless error.  *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (applying harmless error analysis in Social Security case); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis where the ALJ made an incorrect statement of fact).

The Court concludes that the ALJ's error is not harmless for the following three reasons.  First, the ALJ's non-severity finding implicates step two of the sequential process while the ALJ's questioning of the VE implicates steps four and five of this

process.  While it may be true that the Commissioner's error would be harmless at steps

four and five, the Commissioner has not provided any argument that the error at step

two would be harmless at step three of the process, which requires the Commissioner

to consider whether a severe impairment meets or equals one of the listings.

*See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Second, the ALJ's question

to the VE imposing limitations of simple, repetitive tasks with moderate pace

implicated work-related mental activities of understanding, remembering, and carrying

out instructions.  Other work-related mental activities include responding appropriately

to supervisors and co-workers, dealing with changes in a routine work setting, and

using judgment in making work-related decisions.  *See* 20 C.F.R. §§ 404.1545(c),

416.945(c); SSR 96-8p.  There is no evidence that the ALJ considered how Plaintiff's

depression effected these other work-related mental activities, nor does the question to

the VE indicate that these other mental activities were considered by the ALJ or the VE.

Third, "[e]rroneous findings at Step Two usually infect the entire decision, since all of

a claimant's impairments must be considered in combination at Steps Three, Four and

Five."  *Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 518 (D. Md. 2002).  Based on

these reasons, the Court concludes that the Commissioner has failed to show that the

ALJ's error at step two of the evaluation process was harmless error.

As a result, the Court remands the case for the ALJ to determine whether Plaintiff's depression is severe at step two of the evaluation process.

### B.    Mental Limitations and the RFC

Before proceeding to step 4 in the sequential process to determine whether a claimant can perform his past relevant work, the ALJ assesses the claimant's residual functional capacity ("RFC"), which evaluates the most a claimant can do in a work setting despite his work limitations.  20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1), 416.920(a)(4), 416.945(a)(1).   In assessing the RFC, the ALJ is to consider all medically determinable severe and non-severe impairments and to use "all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(2), (3), 416.945(a)(2), (3). To evaluate a claimant's mental abilities, the ALJ must assess the nature and extent of the mental limitations and restrictions and considers the following work-related mental activities: understanding, remembering, and carrying out instructions; responding appropriately to supervision, co-workers and work pressures; dealing with changes in a routine work setting, and using judgment in making work-related decisions.  20 C.F.R. §§ 404.1545(c), 416.945(c); SSR 96-8p.  This RFC is then used in determining whether claimant can perform his past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An ALJ is not required to use criteria in the

34

psychiatric review technique ("PRTF") in determining the RFC.  *See Martino v. Barnhart*, No. 01-17085, 2002 WL 32881075 at * 2 (11th Cir. Sept. 27, 2002) (indicating that the ALJ "is not required to incorporate the 'B' criteria of PRTFs in [the] residual functional capacity assessment").  Instead, "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF."  *See* SSR 96-8p.[13]

The Court concludes that the ALJ erred in determining the RFC.  The Court agrees with the Commissioner that the PRTF findings do not automatically translate into RFC findings.  *See* SSR 96-8p.  However, the Social Security Ruling upon which the Commissioner relies also notes that the RFC assessment requires a more detailed assessment than what is required in completing the PRTF.  *See id.*  As a result, the PRTF findings play some role in making the RFC determination.  *See Ramirez v.*

---

[13]     The "B" criteria in the mental disorder listings involve: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  The "C" criteria include: repeated episodes of decompensation; a residual disease process that resulted in marginal adjustment that even a minimal increase in mental demands or a change in environment would cause decompensation; and a history of one or more years of not being able to function outside a highly supportive living environment.  *See* 20 CFR Pt. 404, Subpt. P, App.1, Listing 12.00.

35

*Barnhart*, 372 F.3d 546, 555 (3d Cir. 2004) ("While SSR 96-8p does state that the PRTF findings are 'not an RFC assessment' and that step four requires a 'more detailed assessment,' it does not follow that the findings on the PRTF play no role in steps four and five, and SSR 96-8p contains no such prohibition."). The ALJ's decision fails to indicate why Plaintiff's mild deficiencies of concentration, persistence, and pace fail to affect her ability to perform work-related mental activities. Also, the ALJ does not discuss why Plaintiff's limitations for Plaintiff's depression do not affect any work-related mental activities. [*See* R17]. Without this discussion, the Court has no basis to determine whether that the ALJ applied the regulations properly in evaluating how Plaintiff's depression influenced the RFC determination. *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987) ("[T]o make our review meaningful, we must be able to determine what statutory and regulatory requirements the ALJ did in fact apply-where we cannot do that we must vacate and require a remand to the Secretary for clarification."). Certainly, the ALJ's determination that Plaintiff's mental impairment mildly affected her concentration, persistence and pace indicates that he believed that Plaintiff's depression affected her mental abilities. Thus, the ALJ needed to explain why the mental impairment had no effect on work-related activities.

The ALJ's silence appears to indicate that he did not consider Plaintiff's depression in formulating the RFC.[14]

Accordingly, the Court finds that the ALJ failed to properly explain why the limitations stemming from Plaintiff's depression did not affect her ability to perform mental work-related activities.

## VIII.  CONCLUSION

In conclusion, pursuant to this Court's power to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405 (g), the Court hereby **REVERSES AND REMANDS** this case to the Commissioner for further consideration of Plaintiff's claims.

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

---

[14]   To the extent that the ALJ did not consider how Plaintiff's depression affected the RFC because the depression did not meet the duration requirement, the Court notes that the Commissioner conceded that Plaintiff's depression met the duration requirement during oral arguments and substantial evidence supports a finding that Plaintiff's depression met the duration requirement.

AO 72A
(Rev.8/82)

**IT IS SO ORDERED and DIRECTED** this the 18th day of January, 2007.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/82)